# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Present: The Honorable    Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
|---|---|
| Not Present | Not Present |

**Proceedings (In Chambers):**     **Order GRANTING in part and DENYING in part Petitioner's petition for a preliminary injunction.**

Before the Court is Olivia Garcia ("Petitioner" or "Garcia"), Regional Director of Region 21 of the National Labor Relations Board's ("Board") Petition for Preliminary Injunction under Section 10(j) of the National Labor Relations Act (the "Act"). Dkt. # 1 ("Petition"). After considering the papers submitted by the parties, the Court GRANTS in part and DENIES in part the Petition for Preliminary Injunction.

## I.    Background

Green Fleet Systems, LLC ("Respondent") provides drayage, warehousing, and transloading services out of a facility in Carson, California. *See Memorandum in Support of Pet.* ("Memo.") 4:15-20. Respondent transports goods in and around Southern California through approximately one hundred truck drivers ("truck drivers"). *Id.* at 4:20-21. Around one hundred of those drivers are classified by Respondent as company drivers ("company drivers") and thirty-five are classified as owner-operated/lease drivers ("lease drivers"). *Id.* While Petitioner argues that the lease drivers are employees under the Act, Respondent contends that they are independent contractors. *See Memo.* 5:18-19; *Opp. to Pet.* 1:8-11.

The International Brotherhood of Teamsters, Port Division (the "Union") began organizing Respondent's truck drivers in May 2012. *Pet. Ex.* 8 at pg. 943. Respondent was officially told of the Union's campaign around January 31, 2013 when several truck drivers attempted to deliver a letter regarding the Union's efforts to Respondent's President, Gary Mooney ("Mooney"). *Pet. Ex.* 8 at pg. 945; *Opp. to Pet. Ex.* 2 ¶ 1.

Soon after, various representatives of Respondent allegedly began engaging in a multitude of unfair labor practices targeted against employees. For example, Petitioner points to several declarations attached to her Petition that charge Respondent's Safety Supervisor, Giselle Rodriguez ("Rodriguez") with soliciting signatures on anti-Union petitions, as well as promising

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#1/3**
**JS-6 (lc)**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
| --- | --- | --- | --- |
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

increased benefits and improved terms of conditions to employees if they refrained from participating in the Union's campaign efforts between February and March 2013. *See Pet. Ex.* 8 at pgs. 401, 889. According to Juan Huerta, a company driver, Rodriguez also interrogated him about his union activities. *Id.* at pg. 401.

The Union intervened on behalf of Respondent's truck drivers and filed an unfair labor practices charge against Respondent with the Board, Case 21-CA-100003, based on these, and other, alleged violations on March 8, 2013 (later amended to include additional charges which are described below). *See Pet. Ex.* 8 at pgs. 31-32.

After investigating these charges, Petitioner issued a Complaint and Notice of Hearing against Respondent on June 27, 2013. *Id. Ex.* 5A at pg. 50. The complaint alleges, *inter alia*, that Respondent violated 29 U.S.C. § 158(a)(1) ("Section 8(a)(1)") and 29 U.S.C. § 158(a)(3) ("Section 8(a)(3)") through Rodriguez's actions in response to a Union organizational campaign. *Id.* at pgs. 51-52.

According to Petitioner, Respondent's misconduct continued. Petitioner contends that between April and July 2013, Respondent instituted new company rules that limited after-hour access to its facility, photographed truck drivers leafleting outside Respondent's facility, interrogated them, and encouraged its employees to spy on Union supporters and to provoke them into physical altercations with the hope to terminate them. *See Memo.* 6: 13-24. A twenty-four hour Union-led strike that occurred during two days in August 2013 led to yet additional alleged Act violations. Petitioner states that there is evidence that Respondent, through its agents, videotaped and photographed truck drivers during the strike, threatened to terminate Union supporters, and encouraged employees to make derogatory remarks and gestures to truck drivers who were protesting. *See Memo.* 6:20-24. Additionally, Petitioner contends that the evidence shows that Respondent retaliated against Paul Quinto ("Quinto") for attending the strike by issuing a warning against him for allegedly violating the company's no-call/no-show policy. *Memo.* 7.

On September 26, 2014, however, Petitioner approved an informal settlement agreement between the Union and Respondent resolving the charges brought by Petitioner's June 27, 2013 Complaint. *Pet. Ex.* 5C at pg. 62. This settlement agreement, Petitioner writes, did nothing to end Respondent's supposed unlawful conduct. Petitioner includes evidence in her Petition that purportedly proves that between September and November 2013 Respondent provided funds to pay for anti-Union posters, interrogated prospective employees about their Union sympathies, threatened to close down the company, solicited anti-Union signatures via an employee, Xiomara Barragan ("Barragan") (who, according to Petitioner, should be classified as

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Respondent's agent), and told employees that union supporters deserved to die through that same employee. *Memo.* 7.

After another Union strike, this one lasting 48 hours, on November 18, 2013, Petitioner writes that there is evidence that Respondent retaliated against two truck drivers for attending the strike and for supporting the Union. *Memo.* 8. First, Respondent withheld work from Amilcar Cardona ("Cardona"), who was a lease driver. *Id.* Second, Respondent created onerous working conditions for Yasser Castillo ("Castillo"), a company driver (for example, by assigning him vehicles that were in poor condition). *Id.* Throughout this period, Respondent ostensibly continued to interrogate employees about their Union sympathies and to solicit anti-Union petition signatures. *Id.*

In late 2013 and early 2014, Petitioner reports, Respondent's unlawful behavior escalated. This time, Respondent retaliated against two lease drivers – Cardona and Mateo Mares ("Mares") – for asserting employee status and filing wage claims against Respondent before California's Department of Industrial relations with assistance from the Union. *Memo* 8; *Pet. Ex.* 8 at pg. 558. Around four months later, on November 20, 2013, which was also the day after the Union's second strike, Respondent removed magnets (which allow drivers to refuel at Respondent's facility) from their trucks and in January 2014 Mooney demanded that they withdraw their claims and threatened to sue them if they did not oblige. *Memo.* 8. Cardona and Mares declare that they refused to do so and were subsequently terminated. *Pet. Ex.* 8 at pgs. 106-09; 428-33.

Castillo declared in his affidavit that soon after Cardona and Mares's termination, Darlene Stevens ("Stevens"), Respondent's Human Resources and Safety Director, told a group of employees said "[they] already fixed one and [were] about to fix another." *Pet. Ex.* 8 at pg. 349. Martin Herrera Menendez ("Menendez"), a company driver, remembers that around three days after Mares and Cardona's termination, Barragan told a group of employees in Spanish, "[t]hat is how all of those that support the Union will end up. They are an example. You do not want to end up like that. Do your job, stay calm. They deserve it." *Id.* at pg. 878. Carlos Sanchez, also a company driver, had a similar recollection of what Barragan told employees. *Id.* at pg. 925.

As a result of these additional acts, the Union filed additional charges against Respondent from December 2014 to January 2014 (all of which were later amended) in the following cases: 21-CA-115910; 21-CA-119154; 21-CA-121368. *See Pet. Exs.* 2-4. Respondent's Labor Consultant Ricardo Pasalagua ("Pasalagua") purportedly told a group of employees around February 2014 that the Union's charges against the company were harming his name and that he

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | | Date | October 10, 2014 |
|---|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | | |

had a list of drivers who were "doing all this" and he threatened reprisals and to countersue them. *Memo.* 9.

Petitioner states that in response to the Union's additional charges and "following an investigation of [the charges], in which all parties were entitled to present evidence" she issued an order revoking the settlement agreement and consolidated the previous complaint with a new complaint ("Consolidated Complaint") on June 18, 2014. *Memo.* 2. The Consolidated Complaint includes a litany of alleged acts by Respondent and claims that Respondent violated the Settlement Agreement, and Sections 8(a)(1) and 8(a)(3) of the Act. *Pet. Ex.* 6A at pgs. 11-12. Petitioner tells the Court that the hearing regarding the Consolidated Complaint began before an Administrative Law Judge of the Board on August 25, 2014 and concluded on September 17, 2014. *Memo.* 3; Dkt. # 29.

According to Petitioner, Respondent's acts have had a devastating effect on the Union's efforts to organize the Respondent's truck drivers. *See Memo.* 9. In short, Petitioner claims that the Union has been unable to gather Union members, has had a difficult time communicating with employees who are afraid that they will lose their jobs, or that Respondent will close down the plant, if they support the Union. *Id.* 9-10.

On August 7, 2014, Petitioner filed the Petition for a 10(j) Injunction before this Court on behalf of the Board asking for interim relief. Dkt. # 1. First, Petitioner asks that this Court order Respondent to cease and desist from its unlawful acts. *Pet.* 20-24. Second, that the Court order Respondent to take the following affirmative actions: (1) reinstate Cardona and Mares to the same position they held at the time they were discharged, (2) remove from its files reference to the unlawful termination of Cardona and Mares and notify them in writing that this has been done, (3) rescind the warning issued to Quinto, (4) rescind the April 30, 2013 work rules limiting access to Respondent's facility, (5) post this Court's order at Respondent's facility and allow employees access to said order in both English and Spanish, (6) have, in the presence of a Board member, the Court's order read in Spanish and English to employees, (7) grant Board agents access to Respondent's facility to ensure compliance with the posting requirements, (8) provide a list of the names and home addresses of company and lease drivers to the Union, (9) grant the Union access to Respondent's bulletin boards, and (10) provide a sworn affidavit from a responsible Respondent official to Garcia setting forth the manner in which it has complied with this Court's order. *Id.* 24-26. The Court notes that the Union also submitted an amicus brief in support of the Petition. Dkt. # 19 ("Amicus Brief").[1]

---

[1] The Union requests that the Court take judicial notice of certain records related to proceedings in other courts and administrative bodies dealing with the employee status of Respondents' lease drivers; administrative reports describing § 10(j) proceedings; and newspaper articles regarding

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Subsequent to the filing of the Petition, Respondent filed its opposition as well as objections to the evidence Petitioner relies on in support of the Petition. Dkt. ## 14, 13. Petitioner and the Union filed replies to Respondent's opposition. Dkts. ## 25, 23 ("Reply" and "Amicus Reply," respectively).

II.    Legal Standard

Section 10(j) provides that in response to a petition from the Regional Director for injunctive relief, the district court "shall have jurisdiction to grant to the Board such temporary relief of restraining order as it deems just and proper." 29 U.S.C. ¶ 160(j). Injunctive relief under Section 10(j) is intended to preserve the status quo pending final action by the Board. *Scott v. Stephen Dunn & Assocs.*, 241 F. 3d 652, 660 (9th Cir. 2001) (abrogated on other grounds). The status quo to be protected is that which existed prior to the employer's unlawful response to the employee's organizing campaign. *Id.*

To determine whether interim relief is appropriate, courts rely on traditional equitable principles. *See Small v. Avanti Health Systems*, 661 F. 3d 1180, 1187 (9th Cir. 2011). To obtain a temporary injunction, the Regional director must establish (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in the Board's favor, and (4) that an injunction is in the public interest. *Frankl v. HTH Corp.*, 650 F. 3d 1334, 1355 (9th Cir. 2011) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)).

In this Circuit, however, courts employ a "sliding scale" approach, such that "the elements of the preliminary injunction test are balanced, so that a stronger showing of one

---

this case. *See Request for Judicial Notice of Amicus Curiae International Brotherhood of Teamsters, Port Division*, Dkt. # 20 ("RJN"). The Court may take judicial notice of and consider matters that are not subject to reasonable dispute, including public records. *See* Fed. R. Evid. 201(b); *Dudum v. Arntz*, 640 F.3d 1098, 1101 n.6 (9th Cir. 2011) (taking judicial notice of a verifiable public record); *U.S. ex rel Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) ("[W]e may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.") (internal quotations omitted); *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F. 3d 954, 960 (9th Cir. 2009) (noting that "[c]ourts may take judicial notice of publications introduced to 'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true."). Accordingly, the Court GRANTS Plaintiff's RJN, but takes notice of the newspaper articles only for the purpose of noting what is in the public realm and makes no finding regarding the truth of the content of the articles.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

element may offset a weaker showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1131 (9th Cir. 2011). Therefore, as the Ninth Circuit explained, if there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the [petitioner]" preliminary injunction is appropriate "so long as the [petitioner] also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. "In all cases, however, the Regional director 'must establish that irreparable harm is likely, not just possible, in order to obtain a preliminary injunction.'" *Frankl v. HTC Corp.*, 650 F. 3d at 1355 (citations omitted).

III.    Discussion

        Petitioner argues that she has a strong likelihood of success on the merits of both her Section 8(a)(1) and 8(a)(3) claims; it is likely that a failure to obtain an injunction will irreparably harm the employees, the Union, and the Board's remedial authority; the balance of the equities tips in favor of granting an injunction; and the public interest will be served by an injunction. *Memo.* 1. In comparison, Respondent contends that each of the four prongs of the traditional test weighs in its favor and, therefore, injunctive relief is unwarranted. *Opp. to Pet.* 1. However, before the Court resolves this dispute, it must address two preliminary issues. The first relates to Garcia's authority to bring this Petition and the second relates to whether the Court should consider Respondent's evidentiary objections.

        A.    Garcia's Authority to Bring Petition

        In its opposition to Garcia's Petition, Respondent claims that she does not have authority to bring this petition under the recent Supreme Court decision, *NLRB v. Noel Canning*, 134 S. Ct. 2550 (2014). *See Opp. to Pet.* 25. Specifically, Respondent argues that Garcia's appointment as Regional Director of Region 21 of the NLRB was invalid because it came at a time when the Board was acting through unlawfully appointed recess appointees. *Id.*

        In *Noel Canning*, a Pepsi-Cola distributor appealed a Board's decision that the distributor had violated the Act. 134 S. Ct. 2550, 2557 (2014). The distributor argued that three of the five members had been invalidly appointed, through the Recess Appointment Clause, by President Obama, and as such, the Board was unable to lawfully act without a quorum. *Id.* The Supreme Court found that President Obama did not have the authority to invoke the Recess Appointments Clause to appoint Sharon Black, Richard Griffin, and Terrence Flynn on January 4, 2012 to the Board. *Id.* at 2557, 2577-78.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|

| Title | Olivia Garcia v. Green Fleet Systems, LLC |
|---|---|

Other than stating that Garcia was appointed by a "quorum-less board," Respondent offers no other evidence that the facts in *Noel Canning* are analogous here. Petitioner offers evidence that she was appointed on December 22, 2011, by Chairman Pearce and Members Becker and Hayes and contends that they did not receive a recess appointment in January 2012. *See Reply to Opp.* 5; *Reply Ex.* 7. The Court finds, therefore, that Garcia has the authority to bring this Petition.[2]

  B.    Respondent's Evidentiary Objections

Next, the Court considers Respondent's evidentiary objections. Respondent submitted twenty-three pages of objections to the evidence provided by Petitioner in support of the Petition and states some of these in its opposition. *See August 29, 2014 Objections to Evidence*; *Opp. to Pet.* 24:9-25:1. The objections are to statements set forth in the affidavits of (1) Amilcar Cardona ("Cardona"); (2) Yasser Castillo ("Castillo"); (3) David Chavez ("Chavez"); (4) Byron Contreras ("Contreras"); (5) Eymhy Guzman ("Guzman"); (6) Reyna Hernandez ("Hernandez"); (7) Juan Huerta ("Huerta"); (8) Mateo Mares ("Mares"); (9) Hildebrando Ronan ("Ronan"); (10) Fermin Mendez ("Mendez"); (11) Martin Herrera ("Herrera"); (12) Jaime Moreno ("Moreno"); (13) Paul Quinto ("Quinto"); (14) Augustin Cuevas Ramirez ("Ramirez"); (15) Carlos Sanchez ("Sanchez"); (16) Paco Castillo ("Castillo"); and (17) Carlos Santamaria ("Santamaria"). Respondent objects to many of these affidavits because they came from Spanish-speaking individuals who signed English-language affidavits that were orally translated to them and which allegedly lack appropriate qualifications about the translator. *See Opp. to Pet.* 24; *August 29, 2014 Objections to Evidence.* The other objections fall under Federal Rules of Evidence 402, 403, 602, 701, and 802.

It is Petitioner's position, however, that the evidence Petitioner submitted, though possibly flawed, can be considered by the Court on a motion for preliminary injunction. The Court agrees. It is well established that trial courts may consider otherwise inadmissible evidence in preliminary injunction proceedings. *See, e.g.*, *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Flynt Distributing Co. v. Harvey*, 734 F. 2d 1389, 1394 (9th Cir. 1984); *Sega Enterprise Ltd. v. Accolade, Inc.*, 977 F. 2d 1510, 1530 n. 10 (9th Cir. 1992). Indeed, district courts have considerable discretion to consider otherwise inadmissible evidence when ruling on the merits of

---

[2] Even assuming, *arguendo,* that Respondent provided sufficient information to prove that Garcia was appointed by Recess Appointees who were unlawfully appointed, the Court notes that Respondent fails to offer any evidence that in addition to invalidating quorum-less Board decisions, *Noel Canning* also invalidates quorum-less Director appointments.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|----------|----------------------|------|------------------|

| Title | Olivia Garcia v. Green Fleet Systems, LLC |
|-------|-------------------------------------------|

an application for a preliminary injunction. *See Flynt*, 734 F. 2d at 1394; *see also Republic of the Philippines v. Marcos*, 862 F. 2d 1355, 1363 (9th Cir. 1988) (observing that the rules of evidence do not strictly apply to preliminary injunction proceedings). That does not mean, however, that issues pertaining to knowledge, hearsay, and translated affidavits have no relevance at this stage of the proceedings. Rather, these issues properly go to weight, rather than admissibility.

C.      Injunctive Relief

Having addressed these two preliminary matters, the Court now considers whether Petitioner has satisfied the traditional four-part test for injunctive relief.

        i.      *Likelihood of Success on the Merits*

To show a "likelihood of success on the merits the Regional Director must show a 'probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred and that [the Ninth Circuit] would grant a petition enforcing that order, if such enforcement were sought.'" *Frankl v. HTC Corp.*, 693 F. 3d 1051, 1062 (9th Cir. 2012). In this Circuit, a Regional Director in a §10(j) proceeding, "can make a threshold showing of likelihood of success by producing some evidence to support the unfair labor practice charge, together with an arguable legal theory." *Small v. Avanti Health Systems, LLC*, 661 F. 3d 1180, 1187 (9th Cir.2011) (citing *Frankl v. HTC Corp.*, 650 F. 3d 1334, 1356 (9th Cir. 2011)) (quotations omitted). "Moreover, when the Director seeks and receives approval from the NLRB before filing a § 10(j) petition, the Director is owed special deference because 'likelihood of success is a function of the probability that the Board will issue an order determining that the unfair labor practices alleged by the Regional Director occurred.'" *Id.* (citations omitted).

As shown below, Respondent includes contradictory evidence in refuting Petitioner's claims that she has a likelihood of success on the merits. Conflicting evidence, however, "does not preclude the Regional Director from making the requisite showing for a section 10(j) injunction." *Frankl v. HTC Corp.*, 693 F. 3d 1051at 1063; *see also Garcia v. S&F Market St. Healthcare*, 2012 WL 1322888, *6 (C.D. Cal. April 17, 2012) (same); *Garcia v. Sacramento Coca-Cola Bottling Co.*, 733 F. Supp. 2d 1201, 1208 (E.D. Cal. Aug. 20, 2010); *Baudler v. American Baptist Homes of the West*, 798 F. Supp. 2d 1099, 1107-08 (N.D. Cal. July 19, 2011) (finding that Respondent employer's evidence disputing the Union's assertion that Respondent had replaced strikers to teach them a lesson did not preclude the Regional Director from showing a likelihood of success because "if credited by a fact-finder, [the Union's] account would

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

demonstrate an improper purpose in hiring permanent replacements."). The Court finds, therefore, that merely contradicting Petitioner's evidence is not sufficient to show that she has failed to meet this prong. This is not to say that the Court will ignore conflicting evidence. Rather, in evaluating the evidence presented, the Court will determine the nature of the conflicting evidence to assess whether Petitioner has met her burden.

> a.     Section (8)(a)(1)

Section (8a)(1), prohibits employers from interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in 29 U.S.C. § 157 ("Section 7"). *See* 29 U.S.C. § 158(a)(1). Section 7 rights include the right to self-organization, the right to form, join, or assist labor organizations, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid protection. *See id.* at § 157.

Petitioner provides a litany of alleged acts (discussed below), all of which have been recognized by the Board to constitute violations of Section 8(a)(1). As such, Petitioner has shown that she has an arguable legal theory that supports an 8(a)(1) violation. The Court must examine the evidence provided by both parties to see whether there is some evidence that the unlawful acts took place.

> 1.     Barragan's Agency Status

Before addressing the specific acts that Petitioner argues led to violations of the Act, the Court will first determine whether, as Petitioner suggests, there is some evidence that Respondent will be charged with the acts supposedly committed by one of its employees. Petitioner charges Respondent with actions allegedly taken by Xiomara Perez Barragan ("Barragan"). According to Petitioner, Barragan is "alleged in the Consolidated Complaint to be Respondent's agent." *Memo.* 7:25-28.

The Board considers an employee to be employer's agent when other "employees would reasonably believe that the employee in question was reflecting company policy and speaking and acting for management." *Einhorn Enters.*, 279 NLRB 576, 576 (1986). The Board has found that an employee acted as employer's agent when the employee acted as conduit between management and employees. *Id.* The Board has also found an employee to act as an employer's agent when at "least one of Respondent's supervisors" implicitly adopted the employee's anti-Union solicitation campaign, *Cmty. Cash Stores*, 238 NLRB 265, 266 (1987), and when an employer reimbursed an employee for her anti-Union activities. *See Overnite Transp. Co. (Dayton, Ohio Terminal)*, 334 NLRB 1074, 1113 (2001).

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

The Union, in its Amicus brief, points to several affidavits that purportedly support Petitioner's claim that Barragan is Respondent's agent. For example, both Menendez and Sanchez declared that Barragan asked them to sign anti-Union petitions at Respondent's facility and told them that she was asking for their signatures so that "the boss" would know whom he could count on. *Pet. Ex.* 8 at pgs. 879, 920. Menendez also stated that he has seen Barragan stand side by side with Pasalagua during anti-Union meetings. *Id.* at 878. Moreno recounted a conversation he had with Rodriguez who told him that Barragan had a list in Steven's office for collecting signatures of anti-union employees and that she could trust Barragan. *Id.* at 889. Moreno also declared that Rodriguez told him that she wanted him to include his name on the list. *Id.* Castillo, in turn, remembers having a conversation with Barragan about anti-Union posters and that after giving her a price of $300.00, "she said that she had to ask Gary (Mooney) if the price was okay" and later gave him $300.00 asking him to make the posters "and that Gary was okay with it." *Id.* at 332.

Respondent refutes Petitioner's claim and includes a declaration from Barragan in which she denies soliciting anti-Union signatures at Respondent's facility or assisting Pasalagua in any meeting. *Opp. to Pet. Ex.* 7 ¶¶ 5,6. Furthermore, she writes that she has never been asked by anyone in management to take "any action in opposition to the organizing campaign" and that "Gary Mooney did not give [her] the money to purchase the signs" that Castillo referenced in his affidavit. *Opp. to Pet. Ex.* 7 ¶¶ 4, 9.

Barragan's declaration explicitly contradicts the evidence submitted by Petitioner. Even with these contradictions, however, Petitioner has shown some evidence and an arguable legal theory that the Board will consider Barragan an agent of Respondent. Respondent has not given the Court a compelling reason to completely dismiss Petitioners' evidence, and thus, even with contradictory evidence, Petitioner has some evidence to show that Barragan is Respondent's agent.

First, employees who saw Barragan stand next to Pasalagua, Respondent's Labor Consultant, could reasonably view Barragan as speaking on behalf of management and being the conduit between employees and Respondent. Respondent could have argued that even if Barragan told employees that the "boss" would know who's on his side by seeing signatures of anti-Union supporters and that she needed to see if Mooney was okay with the price for anti-Union posters, it does not show Respondent implicitly or explicitly adopted Barragan's anti-Union activities because they do not prove that Mooney took any affirmative action or made any affirmative statements. Instead, Respondent writes that "Petitioner cannot establish this alleged violation of Section 8(a)(1) of the Act because [Barragan] is not, and never has been, an agent of Respondent. Rather [Barragan] is an employee-driver, with all of the same duties and

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

obligations as the other employee-drivers." *Opp. to Pet.* 10:7-10. Even if Respondent had made that argument, however, the Court finds that when Rodriguez told Moreno to sign an anti-Union list that Barragan was in charge of, Rodriguez, Respondent's Safety Manager, was explicitly adopting Barragan's anti-Union campaign. As such, the Court finds that there is some evidence that Respondent will be charged with Barragan's actions under a theory of agency. The Court will, therefore, analyze Barragan's alleged unlawful acts under the premise that she acted as Respondent's agent.

>     2.     *Threats of Termination and Plant Closure*

Section 8(a)(1) can be violated in many ways. For instance, an employer can violate the act by threatening a plant closure in response to its employees' union activity. *See Hertzka and Knowles v. N.L.R.B.*, 503 F. 2d 625, 627 (9th Cir. 1974). Although an employer has the right, under the First Amendment, to "communicate to [its] employees any of [its] general views about unionism or any of [its] specific views about a particular union," citing *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 616-20 (1969), and may "even make a prediction as to the precise effects [it] believes unionization will have on [its] company" it may not do so in terms of a threat. *Hertzka and Knowles*, 503 F. 2d at 627. If there is "any implication that an employer may or may not take action solely on its own initiative for reasons unrelated to economic necessities and known only" to the company, the statement is considered a threat and is a violation of Section 8(a)(1). *See id.*

Petitioner argues that Respondent violated Section 8(a)(1) by threatening to close the plant and to discharge employees for participating in Union efforts. In her reply, Petitioner includes an affidavit from Castillo stating that he attended a Union meeting in late June 2014 where he mentioned "that other people were telling [him] that they did not want to join the Union because Gary was saying that he was going to close the company." *Reply Ex.* 3 at pg. 21. Martin Herrera ("Herrera"), also a company driver, declared that he, too, heard from three co-workers that "Ricardo Pasalagua and Owner Gary Mooney stated that if the Union came in they would close the Company." *Reply Ex. 4* at pg. 28-29. If true, these comments from Mooney would be a violation under Section 8(a) (1) as Respondent would be threatening to close the company because of its employees' Union activity.

In response, Mooney declares that he "has never made statements threatening any employee of [Respondent] with termination, reduction in wages, plant closure, discipline, or any other adverse consequence in the event [Respondent] were to unionize." *Opp. to Pet. Ex.* 2, ¶ 59.

Here, the Court is faced with two contradictory versions of Mooney's actions.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Petitioner's evidence constitutes hearsay as neither Castillo nor Herrera heard Mooney threaten to close down the company and, as such, the Court gives it less weight than it does Mooney's statement that he never threatened to close down the company. The Court acknowledges that Petitioner need only produce some evidence that a violation of the Act took place to meet the likelihood of success prong of the test and that it owes the Board deference. However, the Court finds that in this case, Petitioner has produced merely negligible evidence that the alleged act took place since she has failed to point the Court to evidence of anyone affirmatively stating that they heard Mooney make the statements.

According to Petitioner, Respondent also "threatened that all Union supporters would be fired like Cardona and Mares," which would definitely constitute a violation of Section 8(a)(1). *See Memo.* 9. Two company drivers, Menendez and Sanchez, recall that shortly after Cardona and Mares were dismissed, Barragan told a group of drivers that those that support the Union would also be fired. *Pet. Ex. 8* at pgs. 879, 925. Castillo also declared that Barragan told employees after Cardona was terminated that "one of the rats [had] been fired," and then he heard Stevens say, "[w]e are just getting rid of the problem. We already fixed one and are about to fix another one." *Pet. Ex. 8* at pg. 349.

Respondent attempts to refute Petitioner's evidence with declarations from Barragan and Stevens in which they deny making these statements. *Opp. to Pet. Ex. 4* ¶ 12; *Ex. 7* ¶ 7. Again, the Court is faced with contradictory versions of events. Here, however, because Petitioner's declarants state that they heard Barragan and Stevens make these statements, the Court finds that Petitioner has produced some evidence that Respondent violated Section 8(a)(1) by threatening to fire employees for supporting the Union. Specifically, there is some evidence that Barragan told employees, explicitly, that those who support the Union would be fired. Although Steven's statement is less direct, considering the circumstances described by Petitioner's declarants—that Stevens made these statements soon after Cardona was terminated—supports the theory that she was implicitly threatening that other Union supporters would be fired.

### 3. *Soliciting Grievances and Promising Increased Benefits*

An employer can also violate the Act by soliciting "grievances from employees during a union organizing campaign with the express or implied suggestion that the problems will be resolved if the union is turned away." *Ctr. Const. Co. v. N.L.R.B*, 482 F.3d 425, 435 (6th Cir. 2007) (citations omitted).

Petitioner points to evidence that, she argues, shows Rodriguez promising increased benefits to anti-Union supporters and soliciting grievances, which would be a violation of

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Section 8(a)(1). *Memo.* 6. Huerta, a company driver, states that around March 2013, which was during the time that the Union was attempting to organize Respondent's drivers, he had a conversation with Rodriguez in which she asked him "what do the drivers want?" Huerta also recalls that after Rodriguez asked him that question, she said that "everything was good . . . this [was] a good job, Gary [was] a good boss, and the employees have good benefits like medical and sick leave" as well as vacation. *Pet. Ex. 8* at pgs. 399-400. According to Huerta, after telling him that the Union could not guarantee anything, she said, "if you have five sick days and the Union wants six, but if Gary says no, that's it, they cannot obligate him." *Id.* at pg. 400. In turn, Respondent includes a declaration from Rodriguez in which she denies having a conversation with Huerta about the Union. *Opp. to Pet. Ex.* 5, ¶ 2. Rodriguez's denial, however, does no more than contradict Huerta's statement and the Court has no reason to discount Huerta's recollection.

Even if the Court assumes that Petitioner's version of this conversation is true, Petitioner has not provided sufficient evidence and an arguable legal theory that Respondent violated the Act through Rodriguez's conversation with Huerta. Although Rodriguez likely solicited grievances by asking Huerta what drivers wanted, there is no evidence that she promised increased benefits if employees turned down the Union. Even if Rodriguez told Huerta that the Union could not give drivers more benefits if Mooney did not want to provide them, these facts do not support a promise that the solution to employees' demands was turning the Union away. The Court finds that Petitioner has not provided sufficient evidence to meet the Ninth Circuit's likelihood of success standard.

### 4. *Coercive Remarks and Threats*

If an employer interferes with an employee's free exercise of rights under the Act, through coercive remarks, it also violates Section 8(a)(1). *See Tasty Baking Co. & Teamsters Union Local 115, a/w Int'l Bhd. of Teamsters, Afl-Cio,* 330 NLRB 560, 573 (2000) ("The test, in any event, for determining whether an employer's remarks are coercive depends not on the successful effect of such coercion, but rather on whether such remarks may reasonably be said to have a tendency to interfere with the free exercise of employee rights under the Act.) (citations omitted); *see also N.L.R.B. v. Wizard Method, Inc.,* 897 F.2d 1233, 1237 (2d Cir. 1990) (finding statement promising to sue employees who went to the Board was an unlawful threat under the Act).

Petitioner describes several acts by Pasalagua, Respondent's Labor Consultant, that she claims violated Section 8(a)(1). According to Respondent, Pasalagua threatened to sue drivers supporting the Union's charges, or who brought charges against Respondent and threatened

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

threatened reprisals for the same reasons. *Memo.* 13. Petitioner also claims that Stevens and Pasalagua encouraged employees to harass and provoke Union employees and to spy on them. *Id.* Furthermore, Petitioner argues that Respondent violated the Act when Barragan told employees that Union supporters deserved to die. *Id.* 14.

According to Carlos Sanchez, he and Paco Sanchez had a meeting with Pasalagua around February 2014 in which he told them that Castillo had filed a lawsuit against him and asked them to testify in his favor. *Pet. Ex. 8* at pg. 927. Carlos Sanchez declared that Pasalagua also said that he was going to countersue Castillo and that "he had a list of all the drivers who are against the company and who have signed under the water (meaning in secret)." *Id.* at 927. His brother Paco Sanchez recounts a similar story. He declared that in February 2014 he had a meeting with Pasalagua and Carlos where Pasalagua said he had received a lawsuit letter, that he was planning to countersue Castillo, and that he had a list of names of drivers "who [were] doing all this." *Id.* at 939. Reina Hernandez, a company driver who was employed by Respondent briefly at the end of 2012 and then again since October 28, 2013, also declared that she had a meeting with Pasalagua. In this meeting, Pasalagua allegedly told her about a lawsuit brought by Castillo where Castillo charged him with telling "drivers who are against the Union to throw their trucks into those that are with the Union" and that he planned to countersue Castillo. *Id.* at 389-90. If Pasalagua, in fact, threatened legal action against Castillo and said that he had a list of other Union supporters, this would be a clear violation of Section 8(a)(1) because it would interfere with employees' rights to unionize by implicitly threatening to also take action against any other employees who spoke up about any anti-Union remarks that he allegedly made.

Respondent's version of these meetings, however, contrasts sharply with Petitioner's. While Pasalagua does not deny meeting with drivers in February 2014, he states that he did not talk to them about charges brought against him and that he never told anyone that he had a list of employees supporting the union. *Opp. to Pet. Ex.* 6 ¶ 23. Further, in regard to the meetings that he had with the Sanchez brothers, he states that when he met with them, "[at] the inception of the meeting, and before asking Paco and Carlos any questions, [he] assured both them that the meeting was voluntary; that they did not have to participate; that they could walk out of the meeting at any time; and that there would be no reprisals taken against them if they did not wish to provide information in response to any of Petitioner's new allegations." *Id.* at ¶ 23.

In short, as Petitioner, herself, notes, there exists a "credibility dispute" between Respondent's employees and Pasalagua. *Reply* 8. Pasalagua's declaration, however, is not sufficient to refute that Petitioner has provided some evidence that these acts took place as Respondent has provided no compelling reason for the Court to discount Petitioner's evidence.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Therefore, the Court finds that Respondent violated Section 8(a)(1) when Pasalagua told employees that he was going to sue Castillo and that he had a list of Union supporters.

Petitioner also accuses Respondent of violating Section 8(a)(1) when Stevens and Pasalagua told employees to harass, provoke, and spy on Union-supporters and when Barragan told employees that Union supporters deserve to die. *Memo.* 13-14. Petitioner has provided some evidence that these events did, in fact, occur. Castillo, Sanchez, and Menendez all state in sworn affidavits that Pasalagua instructed employees to harass and provoke Union-supporters. *Pet. Ex.* 8 at pgs. 333, 921, 868. Specifically, they state that Pasalagua asked anti-Union employees to provoke Union supporters into physical altercations giving Respondent an excuse to terminate Union supporters. *Id.* Carlos Sanchez recalls that sometime between June 2013 and January 2014, Stevens and Pasalagua made statements to anti-Union employees to the effect that they should report Union-employees who were standing around. *Pet. Ex. 8* at pg. 921. Castillo corroborates Sanchez's statements. *Id.* at pg. 332. Herrera, a company driver, declared that Barragan said various times, between August 2013 and December 2013, that those from the Union deserve to die when other drivers were standing around. *Pet. Ex. 8* at pg. 872.

Pasalagua, Stevens, and Barragan vehemently deny making these statements. *Opp. to Pet. Ex.* 6 ¶¶ 12, 13; 4 ¶ 9; 7 ¶ 7. If true, these acts would certainly violate Section 8(a)(1) because they are coercive in nature and threatening towards Union supporters. Respondent's evidence – Stevens, Pasalagua, and Barragan, denying that the acts occurred – does not refute Petitioner's evidence. As such, the Court finds that Petitioner has provided some evidence that Respondent violated Section 8(a)(1) through the acts described above.

### 5.  *Creating Impression of Surveillance*

The Board has also found that an employer violates the NLRB by maintaining "surveillance of the meetings and meeting places of [the union] and of the activities of . . . employees in connection with [the union]." *Pennsylvania Greyhound Lines, Inc.*, 1 N.L.R.B. 1, 48 (1935). "In determining whether an employer's statement has created an unlawful impression of surveillance, the test is "whether the employees would reasonably assume from the statement that their union activities had been placed under surveillance." *Bridgestone Firestone*, 350 N.L.R.B. 526, 529 (2007) (citation omitted).

Petitioner argues that Respondent violated Section 8(a)(1) when Slayman, Respondent's General Manager, took a photograph of employees leafleting outside of its facility on May 16, 2013. *Reply* 6. There is also evidence, as described above, that Pasalagua told employees that he had a list of Union supporters. *See supra* Section II(C)(i)(a)(4).

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

The Court finds that Petitioner has provided sufficient evidence to meet her burden that Respondent violated Section 8(a)(1) through Pasalagua's statement that he had a list of Union supporters. Pasalagua's statement that he had this list, coupled with his statement that he was planning to countersue Castillo, is both coercive and gave the impression that Pasalagua was keeping track of employees' Union activity and that being on that list could lead to future reprisal. *See id.*

As to Slayman's photograph of employees leafleting, the Court is presented with two competing rationales for the photograph. Petitioner argues that by the mere act of taking the photograph, Respondent caused intimidation and fear among employees. The Court agrees that taking photographs of union activity "tends to create fear among employees of future reprisal" when there is no valid justification for the photograph. *See California Acrylic Industries, Inc. v. NLRB*, 150 F. 3d 1095, 1099 (9th Cir. 1998).

Respondent argues, however, that taking a photograph, on its own, does not violate the Act and that Slayman took the photograph because Carlos Santamaria, a Union agent, was trespassing upon Respondent's property. *See U.S. Steel Corp. v. NLRB*, 682 F. 2d 98, 101 (3rd Cir. 1982) (finding that surveillance by itself does not violate the Act); *Opp. to Pet.* 3. The Union responds by pointing out that Respondent's justification is disingenuous because there were no repeated instances of trespass and Slayman photographed Respondent's employees as well. *Amicus Reply* 9. While the Court finds Respondent's argument meritorious, it also finds that Petitioner has provided an arguable legal theory and some evidence that Respondent's actions were not due to Santamaria's trespass, and that the photograph was taken to document the employees supporting the Union's efforts. The Court finds, therefore, that Petitioner has met her burden as to this alleged act.

6.      *Interrogations of Current and Prospective Employees*

An employer can also violate Section 8(a)(1) by improperly interrogating employees about their union activities. *See Southwire Co.*, 282 N.L.R.B. 916, 917 (1987). The test for evaluating interrogations is "whether under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by the Act." *Id.* (citations omitted).

Although Petitioner includes evidence that Rodriguez, Respondent's Safety Supervisor, asked at least one employee about his union activity, Rodriguez denies doing so. Specifically, Juan Huerta, who's a driver's at Respondent's company, stated that Rodriguez asked him whether the Union had visited him at the house and warned him that all that the Union wanted was money. *Pet. Ex.* 8 at pg. 400. She also, apparently, asked "what do the drivers want?" and

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

then listed various positive aspects of Respondent's company, implying that a Union was not necessary. *Id.* at pg. 400. Rodriguez denies that this conversation occurred. *Opp. to Pet. Ex.* 5 ¶ 2.

Hernandez, one of Respondent's drivers, reports that she was specifically told by Pasalagua during her pre-hiring process in October 2013, "we want to know that you are with the company. . . We want to know that you not going to sign anything with the Union and that you are not going to speak to or have any contact with them." *Pet. Ex.* 8 at pg. 386. Pasalagua denies that he ever "interrogated GFS employees and/or prospective employees about their [U]nion membership, activities, and sympathies" and that he was not in California during the period that Hernandez remember talking to him *Opp. to Pet. Ex.* 6 ¶¶ 19, 21. Petitioner has submitted an affidavit from Hernandez stating that the first day of her employment, and thus the day she spoke to Pasalagua, was in August 2013, not October. *Reply Ex.* 8 at pf. 64-65. The Court will, therefore, not discount Hernandez's previous statements.

These conversations clearly constitute coercive interrogations, and Respondent does not argue otherwise. Instead, Respondent attempts to refute Petitioner's evidence with contradictory versions of what happened. Because the Court finds itself with two equally plausible versions of the events described above, however, Petitioner has met her burden and provided some evidence that employees were interrogated about their Union activities and that the Respondent, through Rodriguez and Pasalagua, interrogated employees in violation of Section 8(a)(1).

> 7. *Soliciting Anti-Union Signatures and Funding an Anti-Union Campaign*

Petitioner argues that Respondent violated Section 8(a)(1) by soliciting anti-Union Signatures and financing an anti-Union campaign. If true, these actions would violate Section 8(a)(1) of the Act. *See Elyria Foundry Co.*, 321 NLRB 1222, 1231 (1996) (finding that providing financial assistance to pro-Company campaign violated Section 8(1)(a) of the Act).

Here, Petitioner points to statement included in Moreno's affidavit, which stated that Rodriguez told him to sign an anti-Union petition that Barragan obtained from Darlene Stevens. *Pet. Ex.* 8 at pg. 889. This testimony is contradicted by Barragan's affidavit, which states that, "no supervisor, agent, manager, consultant, or officer of GFS helped [her] prepare the petition or encouraged its circulation" and that she "maintain[s] custody of the petition in [her] personal automobile" and has "never [taken] it into GFS's facility." *Opp. to Pet. Ex.* 7 ¶ 11.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

As to allegations that Respondent provided funds for an anti-Union campaign, Castillo explains in his affidavit that between June 2013 and September 2013 he was "very active" in the anti-Union campaign and that Barragan would give him money to purchase anti-Union materials. *Pet. Ex. 8* at pg. 332. He describes a conversation he had with Barragan in the fall of 2013 where he told her that it would cost $300 to make anti-Union posters and she said that "she had to ask Gary (Mooney) if the price was okay" and later told him that "Gary was okay with it." *Id.* Mooney, on the other hand, declared that he "has never given [Respondent]'s money or [his] personal money, to Xiomara Perez or anyone else, in order to purchase or cause the distribution of anti-[U]nion signs or posters. Nor [has he] authorized anyone to do so on behalf of [Respondent]." *Opp. to Pet. Ex.* 2 ¶ 58. Barragan's declaration, too, challenges Castillo's recollection. She affirms that Mooney "did not give [her] money to purchase anti-Union signs from Castillo and, in fact, that he has never done so." *Id.* at Ex. 7 ¶¶ 8-9. She explains that she purchased the anti-Union posters with contribution from another employee-driver who also opposed the Union. *Id.* at ¶ 8.

The Court, again, sees no reason to believe one version of events over another and, finds, therefore, that Petitioner has provided some evidence that Respondent violated Section 8(a)(1) through the acts described above.

8.    *Limiting Employee Access*

Lastly, the Court considers Petitioner's argument that Respondent's rules limiting employee access to Respondent's facility violated Section 8(a)(1). According to Petitioner, these measures were taken in response to the Union's campaign, which the Court finds would be a violation of Section 8(a)(1). In *Tri-County Medical Center*, the Board found that "except where justified by business reasons, a rule which denies off-duty employees entry to parking lots, gates, and other outside nonworking areas will be found invalid." 222 NLRB 1089, 1090 (1976); *see also Meijer, Inc. v. N.L.R.B.*, 463 F. 3d 534, 544 (6th Cir. 2009) (finding that employer could not prohibit union solicitation and distribution in a driver check-in area because the area was a mixed-use area as employees were "free to talk, read newspapers and magazines, or stand around until their assigned driving time") (quotations omitted).

Specifically, Petitioner points the Court to evidence showing that between April and July 2013, "Respondent adopted new rules that limited after-hours access to its facility." *Memo* 6:13-15. David Chavez, an employee at Respondent's facility, provides language that was allegedly included in a memorandum distributed by Rodriguez and dated April 30, 2013. *Pet. Ex. 8* at pg. 354. Importantly, the memorandum allegedly states that drivers should leave immediately after

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

finishing their shift and that unauthorized persons will not be allowed in the facility without prior approval. *Id.*

In response, Respondent contends that the heightened security measures were "not enacted in response to the organizing campaign" but were instead for security and safety reasons. *Opp. to Pet.* 4. Respondent points out that employees are permitted to access the facility and are not denied access to the facility when they arrive early for their shifts or during their off days. *Id.* Stevens, Respondent's Human Resources and Safety Director, declares that, in effect, once "security began recognizing [Respondent] personnel (just a week or two after the procedures went into effect), security began permitting access without requiring [Respondent] personnel to stop their vehicles and show identification." *Opp. to Pet. Ex.* 4 ¶ 8. The Court agrees that safety is a legitimate business reason to implement new precautions.

Petitioner argues, however, that Respondent's claim that the "rules were not implemented in response to the union campaign [] lacks credibility." *Reply* 7. Petitioner points out that the new rules were implemented *after* the Union began its efforts and that Respondent "provided no evidence for why the facility suddenly was concerned about unauthorized access and suddenly needed to be made safer." *Id.*

The Court agrees that the timing of Respondent's decision to implement these security measures is suspicious, particularly given the lack of security incidents at Respondent's facility. Furthermore, although Stevens declares that, in effect, employees are allowed to enter the facility without issues and are not prevented from being in the facility during their off days, Respondent does not deny that under its new rules employees have limited access to the facility. Furthermore, because the Court need not decide whether Respondent, in fact, instituted these new rules in response to a Union campaign, but whether Petitioner has provided some evidence that it did, the Court finds that Petitioner has met her burden.

> *b.*    *Section 8(a)(3)*

Section 8(a)(3) prohibits employers from changing an employee's terms and conditions of employment in order to encourage or discourage union activity. 29 U.S.C. § 158(a)(3). Under *Wright Line*, 251 N.L.R.B. 1083 (1980), to prove a violation of Section 8(a)(3), Petitioner must establish, before the Board, by a preponderance of the evidence that anti-union sentiment was a substantial or motivating factor in the challenged employer decision. *Bridgestone Firestone*, 350 N.L.R.B. 526, 529 (2007). To show discriminatory motivation, Petitioner must establish the following: (1) the employee was engaged in union activity, (2) employer had knowledge of that activity, and (3) anti-union animus by the employer. *See Sears, Roebuck & Co.*, 337 N.L.R.B.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

443, 443 (2002). In the absence of direct evidence, animus is not to be inferred lightly. *NLRB v. Gulf States United Telephone Co.*, 694 F. 2d 92, 95 (5th Cir. 1982). Once Petitioner establishes a prima facie case, the burden of persuasion "shift[s] to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Wright Line*, 251 N.L.R.B. at 1089. That is, Respondent must demonstrate by a preponderance of the evidence that it would have taken the same action in the absence of knowledge that the employee was engaging in protected activity. *See Hicks Oil & Hicksgas, Inc.*, 293 N.L.R.B. 84, 85 (1989).

According to Petitioner, she is likely to succeed on her Section 8(a)(3) claims with respect to the allegedly unlawful discharges of Mares and Cardona, the changes of employment conditions for Castillo, and the warning issued against Quinto.

## 1. Discharges of Mares and Cardona

Before evaluating whether Respondent's alleged actions against Mares and Cardona violated Section 8(a)(3), the Court must turn to a hotly disputed issue among the parties; whether Petitioner is likely to succeed in her claim that these two individuals, whom Respondent classifies as lease drivers, should be deemed employees under the Act. Respondent urges the Court to refrain from making a finding regarding Mares and Cardona's employee status arguing that it is a "fact intensive" issue and it has only had "a limited opportunity to make an argument and present supporting evidence" that they are independent contractors. *See Opp. to Pet.* 15. The Court disagrees. First, Respondent offers no authority supporting this claim of impropriety and second, the Court cannot properly assess whether Petitioner will meet her burden that Respondent violated Section 8(a)(3) vis-à-vis the alleged discharge of Mares and Cardona without addressing this issue.

To determine whether an individual is an employee under the Act, the Board applies the common law agency test. *See NLRB v. United Ins. Co. of America*, 390 U.S. 254, 254-57 (1968) (finding that "there is no doubt that we should apply the common law agency test . . . in distinguishing an employee from an independent contractor" under the NLRA Act). The common law test includes, among others, the following factors: (1) the control the employer exercises over the details of the individual's work; (2) whether the work is usually done under the employer's direction; (3) whether the individual supplies the instrumentalities used for the work; (4) the length of time the individual is employed; (5) the method of payment; and (6) the intent of the parties. *Argix Direct, Inc. and Local11, Int. Brotherhood of Teamsters*, 343 NLRB 1017, n. 13 (2004) (citing Restatement (Second) of Agency, Sec. 220)). The Board also

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

considers the entrepreneurial opportunities available to the individual. *Dial-A-Mattress Operating Corp.,* 326 NLRB 884, 891 (1998). The list of factors "differentiating 'employee' from 'independent contractor' status under the common-law agency is nonexhaustive, with no one factor being decisive." *Id.* Furthermore, the burden to show that an individual is not an employee is on the party asserting that the individual is an independent contractor. *See Argix Direct, Inc. & Local 11, Int'l Bhd. of Teamsters,* 343 NLRB 1017, 1020 (2004).

Here, Respondent claims that "Cardona and Mares were at all times independent contractors performing services . . . pursuant to written contracts." *Opp. to Pet.* 15. Specifically, Respondent focuses on Lease and Transportation agreements entered into by the two lease drivers and Respondent. *Id.* at 16. Respondent highlights language in this agreement stating that "it [was] the express intention of the parties that [the] contractor [would] act solely in the capacity of a non-employee independent contractor and not as an employee," as well as language in an "Acknowledgement of Independent Contractor" in which lease drivers acknowledged that they were independent contractors. *Id.* at 16-17. Because lease drivers executed these two documents, Respondent argues, "[t]here can be no doubt that the parries intended to create an independent contractor relationship." *Id.* at 16.

Respondent also includes an affidavit by Mooney in which he describes the relationship between Respondent and lease drivers. First, Mooney declares that lease drivers were permitted to accept or reject assignments whenever they wanted, and thus, according to Respondent, they had "significant entrepreneurial opportunity under the Lease and Transportation Agreements." *Opp. to Pet. Ex.* 2 ¶ 40; *see Opp. to Pet.* 17. Mooney further declares that lease drivers were permitted to hire their own employees and to work for other trucking companies. *Opp. to Pet. Ex.* 2 ¶¶ 41, 42. As far as Respondent's control over the methods and means by which "Cardona and Mares completed their work," Mooney painted a picture of independent contractors who accepted as many assignments from Respondent as they wanted without penalties for rejecting work, who chose their own driving routes, and who were not disciplined or subjected to Respondent's personnel policies. *Id.* ¶¶ 40-48. Mooney asserted that lease drivers provided their own tractors, trucks (for which they assumed complete financial responsibility), as well as work attire and fuel. *Id.* ¶¶14-17, 31-34 49. Lastly, Respondent notes that it compensated lease drivers on a flat-rate basis, per-delivery, such that they were not paid additional money for pre- and post-trip truck inspections, and did not provide them with benefits (*e.g.*, health insurance, holiday pay) or payroll checks. *Id.* ¶¶ 45-60.

If the Court simply accepted Respondent's depiction of its relationship with lease drivers, it would likely find that lease drivers were independent contractors. The evidence that Respondent proffers shows that Mares and Cardona intended (based on their agreement with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**#1/3**
**JS-6 (lc)**

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Respondent) to be independent contractors and operated without any control from Respondent.

While Petitioner and the Union do not dispute that Respondent and the lease drivers entered into a contractual agreement with the language quoted above and that lease drivers were not provided with payroll checks or the benefits that company drivers enjoyed, they argue that those factors do not outweigh Respondent's substantial control over the lease drivers' work and the lease drivers' limited entrepreneurial opportunities. The Union argues that because Mares and Cardona, who are not fluent in English, did not understand the agreements, the agreements should not carry much weight in the Court's determination. *See, e.g. Pet. Ex. 8* at pg. 90 ("The [Lease and Transportation Agreement Between Green Fleet Systems LLC and Independent Contractor] is written in English. I attempted to read the contract, but was not able to understand it because I only understand about 25% of what I read in English and they were hard words to understand.").

The Union also points to evidence offered by Petitioner that factually contradicts Respondent's evidence. For example, in arguing that lease drivers had no entrepreneurial opportunities, the Union points to statements made by Mares and Cardona that they know of lease drivers who were disciplined for not accepting assignments as offered. *Pet. Ex. 8* at pg. 93. In her reply, Petitioner also includes an affidavit from Patricia Lozano ("Lozano"), a lease driver, who declared that both she and her husband were disciplined for refusing certain work assignments. *Reply Ex.* 5 at pg. 45. According to Lozano, Toby, manager at Respondent's facility, told her that she "had to do the job she was given" and when she refused, told her there were no dispatches for her that day so she went home. *Id.*

The Union also claims that Respondent "specifically" told Mares and Cardona that they could not hire subcontractors. *Amicus Brief* 4:17-18. Cardona declares that he "[has] never hired others to perform work using the truck [he] was leasing" and that "[he] was told by Gary Mooney and Giselle Rodriguez in or about 2008 shortly after getting the truck that [he] was the only person permitted to drive the truck" which he "took to mean that [he] could not hire anyone to drive [his] truck." *Pet. Ex. 8* at pg. 98. Mares also stated that Rodriguez told him that he was the only person allowed to drive the truck, which he interpreted to mean that he could not hire other drivers to drive for him. *Id.* at pg. 418. Mooney declared, explicitly, however, that both Cardona and Mares were "permitted, by the terms of the Lease and Transportation Agreements, to hire and utilize other drivers to perform the services for [Respondent]." *Opp. to Pet. Ex.* 2 ¶ 41.

To refute Respondent's statement that lease drivers were permitted to perform work for other transportation companies, Petitioner includes statements from lease drivers purportedly stating the opposite. *See Opp. to Pet. Ex.* 2 ¶ 42; *Reply* 12; *Pet. Ex. 8* at pgs. 89-94.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Specifically, Cardona stated that Rodriguez informed him that he could not take the truck that he was leasing from Respondent home and that "it had to stay parked in the Employer's yard" when he was not driving it. *See Pet. Ex. 8* at pg. 92. Menendez, a company driver, also declared that as far as he's aware, "lease drivers are not permitted to take their trucks home . . . and are not permitted to use their truck for any non-work related reason." *Id.* at pg. 864.

The Union also points to two examples, not expressly refuted with evidence from Respondent, of lease drivers being allegedly disciplined for modifying their trucks. First, Cardona declared that a former lease driver was disciplined for adding a ramp to his truck. *Pet. Ex. 8* at pg. 97. Second, Mares stated that a lease driver was asked to remove a sticker with her name on it and that the company logo had to stay on the truck. *Id.* at pg. 421. Mooney declared that the Department of Transportation imposes certain regulations like "displaying the company logo of the responsible carrier on the truck" *Opp. to Pet. Ex. 2* ¶ 42, but provided no explanation for the alleged incident with the driver's ramp.

The Union points the Court to a memorandum Rodriguez addressed to Respondent's drivers stating that company drivers will be suspended for a day if they have an accident, whereas "owner-operators" will not be offered a dispatch if they have accidents. *Pet. Ex. 8* at pg. 490. The Court agrees that this refutes Mooney's claim that lease drivers were not exposed to Respondent's personnel policies. Although, technically, Respondent's response differs with regards to lease drivers and company drivers, the evidence still shows that there are certain personnel policies to which lease drivers are subject.

When deciding whether an individual is an employee, the Board must consider many facts, with no one fact being determinative. Here, the parties dispute a majority of the facts and the Court has not been provided a reason to believe one party over the other. As it is, the Court knows that lease drivers entered into agreements where they were classified as independent contractors, they were not receiving benefits given to other employees, and they were not given dispatches if they had accidents. As to the other evidence, both parties offer credible evidence supporting their own claims. Because Respondent has not provided the Court with a compelling reason to disbelieve Petitioner's declarant's the Court finds that Petitioner has provided some evidence that Cardona and Mares will be seen as employees under the Act.

Having determined that Petitioner provided sufficient evidence that the Board will view Cardona and Mares as employees, the Court analyzes the alleged retaliatory acts with which Petitioner charges Respondent. Specifically, Petitioner argues that Respondent retaliated against both lease drivers first by removing a magnet allowing them to fuel at its facility, and then by terminating their employment for both Union activities and filing wage claims with the

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|----------|------------------------|------|------------------|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

California Department of Industrial Relations.

First, Petitioner has established that Respondent was aware of Cardona and Mares's Union activity, and Respondent does not dispute that. Both employees openly participated in both Union strikes. *Pet. Ex.* 8 at pg. 104. 106, 424,427. According to both lease employees, Respondent removed the diesel magnet from their truck in November 2013, after they participated in the Union's second strike. *Id.* at pgs. 106; 427. While Respondent points out that Petitioner confused fueling magnets with radio frequency devices, it does not point to any evidence refuting that Respondent did, in fact, take this action. Furthermore, the Court agrees that removing the magnets while both lease drivers were participating in the strike, such that when they returned they had to incur higher expenses refueling elsewhere provides some evidence that Respondent retaliated against both lease drivers for their Union participation in violation of Section 8(a)(3).

To support her claim that Respondent terminated the lease drivers' employment in retaliation for their Union activities, Petitioner provides affidavits from both lease drivers in which they state that Respondent's president told them to withdraw their state claims in order to continue working. *Id.* at pgs. 106-09;428-30. Cardona recalls that Mooney told him that his contract with Respondent had expired and that he had three options: 1) he could buy the truck that he was leasing for around $16,400.00 but he had to drop his state wage claims; 2) he could continue working at Respondent's facility with financing for the truck, but he had to drop his wage claim; or 3) he could buy the truck for $50,000.00 and he could leave Respondent's facility but he had to drop his wage claim. *Id.* at 107. When Cardona refused, he remembers that Mooney said that he was terminated. *Id.* Mares recalls a similar conversation where Mooney told him that he could continue working at Respondent's company provided that he drop his state claims and that when Mares refused to do so Mooney said, "If you don't drop the case, you cannot work here . . . let me have your key." *Id.* at pgs. 428-29. Petitioner also provides evidence that Cardona and Mares filed these wage claims jointly, listed the Union as their representative, and convinced other co-workers to file similar claims, bringing them under the protection of the Act. *Eastex, Inc. v. NLRB*, 437 U.S. 556, 566-67 ("[T]he 'mutual aid or protection' clause [of 29 U.S.C. § 157] protects employees from retaliation by their employers when they seek to improve working conditions through resorts to administrative and judicial forums.").

In response, Respondent does not point the Court to evidence refuting the lease drivers' version of these conversations. Respondent also does not provide a compelling argument that Cardona and Mares's actions of instituting wage claims, if they are both considered to be

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

employees, were not protected by the Act. Instead, Respondent argues that any act it took with regard to Cardona and Mares are not covered by the Act. *Opp. to Pet.* 15.

However, because the Court has found that Petitioner has met her burden that Cardona and Mares will be found to be employees under the Act, it also finds that Petitioner has provided some evidence that Respondent's acts – removing Cardona and Mares's refueling magnet and terminating them when they refused to drop their wage claims – violated Section 8(a)(3).

### 2. *Written Warning Issued to Paul Quinto*

Petitioner argues that Respondent violated Section 8(a)(3) when it issued a written warning to Quinto for violating the no-show/no-call policy on the second day of the August 2013 strike. *Memo.* 15. As an initial matter, the Court notes that two points can readily be resolved in Petitioner's favor. First, the affidavits produced by Petitioner all support a finding that Respondent was aware that Quinto was engaged in concerted activities. For instance, since around June 2013 Quinto wore a Union shirt and pin to work three to four times a week to work. *Pet. Ex.* 8 at 898. Second, Respondent issued a written warning to Quinto for allegedly violating Respondent's no-show/no-call policy – neither party disputes these facts. *Opp. to Pet. Ex.* 2 ¶¶ 51-52.

However, the question here is not simply whether Respondent issued a written warning to an employee whom it knew was engaged in concerted activities, but whether Petitioner has sufficiently shown that Respondent's action was motivated by anti-Union animus. Petitioner has proffered evidence that he spoke to Mooney and told him that he would not be at work the next day because he planned to participate in the strike. *Pet. Ex.* 8 at pg. 904. In relaying his conversation with Mooney, Quinto said that after he told Mooney that he would miss work because he was going to attend the strike, "Mooney did not say anything in response" but Quinto "know[s] he heard [him]." *Pet. Ex.* 8 at pg. 904. Quinto also stated that he was in the same room with Mooney when he told him that he was not going to work. *Id.*

Respondent tells a different story about the same encounter. According to Respondent, Quinto never told Mooney that he would be missing work the next day. *Opp. to Pet.* 10-11. Respondent also argues that even if Quinto did tell Mooney that he was missing work for the strike, Quinto would have still failed to follow the company policy with regards to absences by merely telling Mooney and not his supervisors that he was missing work, warranting the written warning. *Opp. to Pet.* 11.

The Court agrees with Respondent. Even assuming that Mooney heard Quinto, Quinto still failed to abide by Respondent's no call/no show policy. Petitioner has not presented compelling

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|----------|------------------------|------|-------------------|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

evidence showing that Respondent's action was taken because Quinto attended the protest and not because he violated the policy. In her Reply, Petitioner cites to *NLRB v. Washington Aluminum*, for the proposition that the Act "gives employees the right to walk off their jobs to protest what they perceive to be intolerable working conditions, without prior notice to their employer, and without following established plant rules." 370 U.S. 9 (1962). That is not the issue at hand. It is not whether Quinto had the right to walk off his job to protest that the Court must decide, but whether Petitioner has provided evidence that Respondent's action of issuing a written warning was motivated by anti-union animus. Petitioner has failed to do so.

> 3. *Changing Terms of Employment for Castillo in Retaliation for His Union Support*

The Court next considers whether Petitioner is likely to succeed on her Section 8(a)(3) claim with respect to Castillo. One issue can readily be resolved. Petitioner has produced sufficient evidence establishing that Respondent was aware that Castillo was involved in Union activity. Castillo, although not involved with the Union prior to September 2013, openly participated in a public Union-organized strike on November 18, 2013. *Pet. Ex.* 8 at pgs. 327-28. Furthermore, since the day of the November strike, Castillo has worn Union shirts and buttons to work. *Id.*

According to Petitioner, soon after Castillo's public participation in the Union-led strike, his conditions at work changed drastically. *Memo.* 18. Specifically, Petitioner and the Union claim that since the November strike, Respondent has not timely fixed maintenance issues with the truck that Castillo drives, that it has assigned him trucks that are in poor condition, and has made him wait for truck keys after he's reported to work, thereby limiting his opportunity to earn "incentive compensation." *Reply* 18; *Amicus Reply* 7. Certainly the timing of these alleged acts by Respondent is suspicious, coming about after Castillo openly supported the Union. *See Golden Day Schools, Inc. v. NLRB*, 644 F. 2d 834, 838 (9th Cir. 1981) (finding the timing of discharge relevant in a Section 8(1)(3) analysis).

The analysis does not end there. The record contains evidence disputing that Respondent adversely changed Castillo's conditions at work. First, Respondent produced evidence that Castillo has been assigned truck 42 – the alleged faulty truck – many times before his participation in the strike. *Opp. to Pet. Ex.* 3 ¶ 6. Second, Respondent argues that Castillo never reported any issues with the maintenance of the truck that he was assigned. *Opp. to Pet.* 14. In her Reply, Petitioner does not challenge Respondent's evidence as to these points. Therefore, Respondent provided sufficient support to refute Petitioner's evidence that Castillo was assigned a faulty truck and that Respondent failed to fix maintenance issues that he brought up for participating in the Union's efforts.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|----------|------------------------|------|------------------|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Respondent also supplies evidence allegedly showing that Castillo waited for trucks before his participation in the strike. *Opp. to Pet. Ex.* 3 ¶¶ 12-15. For example, the evidence demonstrates that Respondent waited longer than an hour for a truck at least four times in the two months before the November strike. *Id.* However, Petitioner and the Union point to Respondent's evidence that shows that Castillo waited for a key fifty percent of the time after he participated in the strike. *Reply* 10-11. Respondent states that it has not deliberately made Castillo wait and that Castillo has waited when other drivers were late turning in the keys to the same truck that Castillo was driving. *Opp. to Pet.* 12. Castillo states that at least half of the times he has been forced to wait for a key, Rodriguez made him wait even after the driver had arrived with the key. *Pet. Ex. 8* at 338. The Court finds that because Respondent's records show that Castillo waited around 50% of the time for a truck key, and in half of those instances the driver who had his key was allegedly not late, Petitioner has provided sufficient evidence that Respondent worsened his work conditions as a result of his Union support because of the timing of these alleged acts.

The Court takes note, too, that Castillo declared that his salary has declined by approximately $200 since the November strike. *Pet. Ex.* 8 at pg. 338. Castillo claims that the lower wages are a result of assignments that pay less money. *Id.* Respondent has not disputed this fact nor offered an explanation that contradicts Castillo's assertion. The Court finds this change in salary suspicious, especially considering the timing of these events.

Therefore, Petitioner has provided sufficient evidence that Respondent has retaliated against Castillo for his Union activities by making him wait for his keys and by giving him assignments that pay less money in violation of Section 8(a)(3).

    *c.*     *Conclusion*

There is some evidence that Respondent violated Section 8(a)(1) by threatening termination of Union supporters, making threatening and coercive remarks, creating an impression of surveillance, limiting employee access to its facility, interrogating employees about their Union activities, soliciting anti-Union signatures, and funding an anti-Union campaign. There is also some evidence that Respondent violated Section 8(a)(3) by removing fueling magnets from Mares and Cardona's trucks, terminating them, and changing Castillo's working conditions.

    *ii.*     *Likelihood of Irreparable Harm*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**#1/3**
**JS-6 (lc)**

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

In the Ninth Circuit, a Director needs to make a showing that irreparable harm is likely under *Winter. Small v. Avanti Health Systems, LLC*, 661 F. 3d 1180, 1191 (9th Cir. 2011). While likely is certainly a higher standard than "possible" the Ninth Circuit has emphasized that "the Director need not prove that irreparable harm is certain or even nearly certain." *Id.* Furthermore, in our Circuit, "permit[ting an] alleged unfair labor practice to reach fruition and thereby render[ing] meaningless the Board's remedial authority *is* irreparable harm." *Id.* (emphasis in original) (citing *Frankl*, 650 F. 3d at 1362) (finding that district court did not abuse its direction in determining that Director had shown a likelihood of irreparable harm when Director established a likelihood of success on the merits).

Petitioner argues that she has shown a likelihood of irreparable harm because 1) she has shown that there is a likelihood of success that Respondent violated the Act, 2) the termination of Mares and Cardona "sends an inescapable message to Respondent's remaining employees" that they too, will be terminated if they support the Union and neither the Union nor the Board will be able to help them, and 3) the Union has already shown that the termination in conjunction with Respondent's other threats and actions have had a chilling effect on the organizing campaign. *Memo.* 21-22; *see Pey v. Excel Case Ready*, 238F. 3d 69, 75 (1st Cir. 2001) ("[T]he fear of employer retaliation after the firing of union supporters is exactly the 'irreparable harm' contemplated by § 10(j).") (citations omitted). Furthermore, Petitioner fears that if the Court does not provide interim relief, the Union will be unable to remove the chilling effect of Respondent's actions because the Board will likely delay issuing its final order. The Court agrees with Petitioner.

Respondent argues that the Court should disregard any arguments of a chilling effect from Mares and Cardona's alleged termination because they were not employees, and thus, could not be terminated. *Opp. to Pet.* 19-20. Because the Court has found that Petitioner provided sufficient evidence that the Board will see Mares and Cardona as employees, it finds Respondent's arguments inapplicable to this analysis.

Respondent also argues, however, that Petitioner has not shown that Respondent's actions have had a chilling effect on the organizing campaign. Respondent attacks testimony from Union organizers Eymhy Guzman ("Guzman") and Santamaria arguing that their statements that employees are afraid of losing their jobs for supporting the Union constitutes hearsay. *Id.* 20. First, the Court agrees with Petitioner that the employees' statements can be considered as an exception to hearsay to show their state of mind. *See Fed. R. Evid.* 803(3). Even if this were not the case, Petitioner has included plenty of evidence from Guzman and Santamaria that is not hearsay describing the effect of Respondent's alleged conduct on their organizing efforts. Guzman attested that she has a harder time speaking to employees and that

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

attendance at Union meetings has declined since Cardona and Mares were terminated. *Pet. Ex. 8* at pgs. 373-75. Santamaria, too, declared that since Mares and Cardona's termination, employees have refused to speak to him and refuse to take literature from him. *Pet. Ex. 8* at 948-49. Furthermore, Petitioner has provided statements from employees stating that they fear being terminated for supporting the Union. Sanchez, for example, explicitly said that he believes he may be "terminated for openly supporting the [U]nion" and that he wears a vest with the Union's name does not refute his belief. *See id.* at pg. 923. Lozano too, said that she has "not participated in the Union organizing campaign at [Respondent's facility] because [she] is scared of being terminated by [Respondent] for supporting the Union." *Reply Ex. 5* at pg. 44. Respondent implies that these fears, if true, are unfounded because Petitioner has "not identified a single employee-driver who has allegedly been terminated for his/her union activities or sympathies." *Opp. to Pet.* 21. The Court disagrees. Even if Respondent is right and he has not terminated an employee, it is likely that other conduct with which it is charged has caused employees to be fearful.

The Court finds that Respondent's alleged conduct will likely cause irreparable harm because Petitioner has shown that the Union's organizational efforts have been threatened, and that without interim relief the Union may be unable to organize employees who would otherwise be interested in participating in the Union's efforts.

       *iii.*    *Balance of the Equities*

In assessing whether a Regional Director has met the balance of the equities prong, "the district court must take into account the probability that declining to issue the injunction will permit the alleged unfair labor practice to reach fruition and thereby render meaningless the Board's remedial authority." *Small*, 661 F. 3d at 1196 (citing *Frankl*, 650 F. 3d at 1365).

Here, Petitioner argues that the balance of the hardships tips in favor of granting relief because great hardships will befall (1) employees, who will be afraid to participate in Union efforts; (2) the Union, that will lose support; and (3) the Board's remedial process, which may come after it is too late to restore the harm caused by Respondent's alleged acts. *See Memo.* 23. Petitioner also points out that "[g]iven the protracted period during which the Board may consider this case, and the extremely difficult economic times, the discharged employees may be forced to relocate to different cities in order to support themselves and their families." *Memo.* 23. In response, Respondent provides that it "will suffer great hardship if the requested injunctive relief is granted" and claims that the mandatory "relief is unwarranted, overly broad, and would have detrimental effects on Respondent's business operations." *Opp. to Pet.* 22.

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

Respondent provides no further detail, however, of *how* relief is unwarranted. Moreover, simply stating that the injunction is overly broad does not explain the detrimental effects of a temporary injunction. The Court agrees with Petitioner that the balance tips in favor of granting interim relief as the risk of permanent negative effects to the Union, and the hardship for Mares and Cardona, outweigh any hardship to Respondent. As the Union points out, Mares and Cardona are "experienced drivers with good work records over approximately five years of employment" and Respondent has not shown that it will be harmed if ordered to reinstate them. *See Amicus Brief* 23.

> iv. *Public Interest*

In "§10(j) cases, the public interest is to ensure that an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Small*, 661 F. 3d at 1197 (citations omitted) (citing *Frankl*, 650 F. 3d at 1365). In the Ninth Circuit, when the Director makes a strong showing of likelihood of success and of irreparable harm, "the Director will have established that preliminary relief is in the public interest." *Id.* (citations omitted) (citing *Frankl*, 650 F. 3d at 1365).

Petitioner argues that it is in the public interest to issue an injunction to ensure that the alleged unfair labor practices do not chill Union activity so much that when the Board finally acts, the Union will be unable to revive its efforts. *Memo.* 24. Furthermore, Petitioner argues that an injunction is in the public interest to deter continuing violations. The Court agrees. Here, Petitioner has shown that she has a likelihood of success and thus, the Court finds that it is in the public interest to halt Respondent's alleged unlawful acts and to preserve the Board's remedial power.

In response to Petitioner's arguments, Respondent makes several arguments. It argues that injunctive relief would wrongfully enjoin an employee from opposing the Union, would silence Respondent in violation of its right to protected speech, and is inappropriate because the issue of Mares and Cardona's alleged termination is a private contractual matter. The Court finds Respondent's arguments unavailing. First, Petitioner has provided sufficient evidence that the Board will consider Barragan to be Respondent's agent. Therefore, her anti-Union campaign has the effect of being run by Respondent, especially when Rodriguez supported Barragan's efforts and Mooney allegedly provided funds for anti-Union materials. Second, Respondent makes no showing of *how* an injunction will curtail its protected speech. Such generalized claims, without more, are unpersuasive. Lastly, as discussed above, Mares and Cardona's issues are not simply private contractual issues because they are Union supporters and have encouraged

**CIVIL MINUTES - GENERAL**

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

other employees to also make claims enforcing their rights. As such, the Court finds that a temporary injunction is in the public interest.

The Court finds that Petitioner has met all four prongs of the test set out by *Winter* and has shown that a temporary injunction is warranted.

v.     *Relief Requested*

While the Court concludes that Petitioner has shown that she is entitled to a temporary injunction, the relief requested is overbroad. As discussed above, injunctive relief is intended to preserve the status quo, and therefore, the Court seeks to restore conditions at Respondent's facility to those conditions that existed before the employer's alleged unlawful acts. *See Scott v. Stephen Dunn & Assocs.*, 241 F. 3d 652, 660 (9th Cir. 2001) (abrogated on other grounds).

Here, ordering Respondent to cease and desist from its unlawful acts is appropriate because it restores Respondent's facility to pre-violation conditions. The same rationale applies to all affirmative orders granted. Some requests, like ordering Respondent to provide the Union with a list of the names and home addresses of company and lease drivers are unwarranted. The Union argues that such order will level the playing field and cites to a Board decision stating that providing the names and addresses of employees was adequate because it "attempts to level a playing field that has been tilted against the employees' organizational rights . . ." *In re Blockbuster Pavilion*, 331 NLRB 1274, 1275 (2000). In that case, however, six years had passed since the alleged Act violations. *Id.* That is not the case here, and providing the Union with this information will provide the Union with an unwarranted advantage because the other remedies will restore the status quo.

The other affirmative orders granted re-establish the status quo at Respondent's facility. For example, re-instating Cardona and Mares will ease employees' fears of being terminated in retaliation for supporting the Union. Furthermore, less restrictive access rules will allow Union-supporting employees to reach out to other employees about the Union's efforts. The order to translate and post this Order at Respondent's facility will eliminate the allegedly coercive environment that Respondent has created in response to the Union's organizational drive.

IV.   Conclusion

For the reasons stated above, the Court GRANTS in part and DENIES in part Petitioner's Petition for a 10(j) injunction. The Court HEREBY ORDERS the following interim relief:

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |

1.  That Respondent cease and desist from the unlawful acts described in the Petition, *see Pet.* at pgs. 20:14-24:4 ;

2.  That Respondent reinstate Cardona and Mares to the same positions they held at the time they were discharged, or to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed while working for Respondent within seven days of this Order;

3.  That Respondent remove from its files references to the termination of Cardona and Mares and notify them in writing that this has been done within seven days of this Order;

4.  That Respondent rescind the April 30, 2013 work rules limiting access to Respondent's facility within seven days of this Order;

5.  That Respondent post this Order at Respondent's Carson facility and allow employees access to said order in both English and Spanish where notices to employees are customarily posted; maintain these postings during the Board's administrative proceeding free from all obstructions and defacements; provide employees free and unrestricted access to this Order;  and translate the Order into Spanish with approval by the Regional Director within ten days of this Order; and

6.  That Respondent provide a sworn affidavit from a responsible Respondent official to Garcia setting forth the manner in which it has complied with this Court's order within twenty days of this Order.[3]

## IT IS SO ORDERED.

---

[3] The Court DENIES all other affirmative requests as overbroad and unnecessary to re-establish the status quo.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 14-6220 PSG (JEMx) | Date | October 10, 2014 |
|---|---|---|---|
| Title | Olivia Garcia v. Green Fleet Systems, LLC | | |